UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**LAMONT HAMMOND,**<br><br>**Defendant.** | **Case No. 25-CR-229 (TJK)** |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. The defendant, Lamont Hammond, is before this Court after pleading guilty to one count of Unlawful Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). For the reasons that follow, the United States respectfully requests that the court sentence the defendant to a term of 51 months' imprisonment. This sentence is at the bottom of the guidelines range calculated by U.S. Probation. Further, the United States is asking for three years of supervised release.

## I. FACTUAL BACKGROUND

On July 10, 2025, the Defendant was caught in a stolen Jeep driving through Washington, D.C. with a loaded gun and extended magazine in his lap. Specifically, on that day at approximately 9:40 p.m., Metropolitan Police Department (MPD) Officer Timothy Ahl, Jr. stopped the defendant in the stolen Jeep Wrangler on Massachusetts Avenue Southeast. When Officer Ahl approached the Defendant, the defendant had on a cross-body satchel with an open zipper.

Officer Ahl stepped the defendant out of the vehicle and placed him into handcuffs. During the handcuffing process, the cross-body satchel fell from the defendant's shoulder and became entangled around his feet. Officer Ahl picked up the satchel and immediately found a

firearm.



***The Satchel and Firearm After Falling to the Ground***

The firearm had a Glock 17 upper/slide with serial number KU847. The lower receiver was made of polymer, had no serial number, and was marked with the inscription "P80," indicating that it was privately manufactured. With the gun, the defendant had a magazine loaded with a 31-round capacity magazine, which was loaded with 18 rounds of 9mm ammunition. One additional round of 9mm ammunition was loaded into the chamber of the pistol—ready to fire.




In the course of the defendant's arrest, he admitted to taking a "perc" about one hour earlier—before deciding to get behind the wheel of a motor vehicle with a loaded gun. The defendant decided not to go to the hospital, and he was transported to the first district for processing.

Swabs were taken from the exterior components of the recovered firearm, as well as from the lip and base of the extended magazine, and compared to a buccal taken from the defendant. Due to the complexity of the mixture obtained from the exterior components of the firearm, no conclusions could be drawn. As to the swabs from the lip and base of the extended magazine inserted into the weapon, the DNA obtained was interpreted as originating from three individuals, and it was 79 billion times more likely if the defendant and two unknown, unrelated people contributed to the mixture than three unknown, unrelated people.

## II. PROCEDURAL HISTORY

On July 14, 2025, a magistrate judge signed a criminal complaint, charging the defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). (ECF 1). On August 8, 2025, a federal grand jury returned a two-count indictment, charging the defendant with violation of 18 U.S.C. § 922(g)(1) in Count One and violation of 22 D.C. Code § 4503 in Count Two. (ECF 11). On May 12, 2026, the defendant pled guilty pursuant to a negotiated agreement. (ECF 30). Under the agreement, the defendant pled guilty to Count One of the Indictment in exchange for the government agreeing to dismiss Count Two. (ECF 30).

## III. LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal

conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
(i) issued by the Sentencing Commission ...; and
(ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –
(A) issued by the Sentencing Commission ... and
(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## IV. UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES

### A. The Defendant's Total Offense Level is 17

Rogers' total offense level is 19 under the calculations listed below:

*Count One: 18 U.S.C. § 922(g)(1)*

| | | |
|---|---|---|
| U.S.S.G § 2K2.1(a)(4)(B) | Base Offense Level | 20 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | - 3 |
| | **Offense Level** | **17** |

The base offense level for Count One is 20 under U.S.S.G. §2K2.1(a)(4)(B) because, as discussed below, the offense involved a semi-automatic firearm described in 26 U.S.C. 5845(a) and he had been convicted of a prohibited offense at the time he committed the instant crime.

Three points are deducted for acceptance of responsibility under U.S.S.G. §3E1.1(b), for a **total offense level of 17**.

**B. The Defendant's Criminal History Category is VI, and His Guidelines Range Is 51 to 63 Months' Imprisonment**

The government concurs with Probation's assessment of the defendant's criminal history, as set forth in the PSR. U.S.S.G. § 4A1.1 governs the calculation of a defendant's criminal history for Guidelines' purposes. Section 4A1.1 assigns "points" for each of defendant's prior sentences of imprisonment; the number of criminal history "points" assigned to each sentence depends on the severity of the sentence and when it was imposed. U.S.S.G. §§ 4A1.1(a)-(d). As reflected in the PSR, the defendant's total criminal history score is seventeen (17), establishing a criminal history category of VI. *See* PSR at 16, ¶38.

With a criminal history category of VI and a total offense level of 17, the defendant's guidelines range is 51 to 63 months' imprisonment. Consistent with the plea agreement, the government will cap its allocution at 51 months of imprisonment.

## V. THE GOVERNMENT'S SENTENCING RECOMMENDATION

The crime at issue here merits 51 months of incarceration. In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the desire to avoid unwanted sentence disparities, § 3553(a)(6).

**A. Nature and Circumstances of the Offense**

The danger in this offense was compounded by several risk factors. The defendant knowingly possessed a loaded semi-automatic firearm, with a round chambered and an extended-capacity magazine, on a busy street in the District of Columbia. The defendant was riding in a

stolen car with the unholstered gun sitting in a bag on his lap. That conduct alone possessed a substantial risk to the public. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").

But the danger was not just confined to the defendant in the car but also to everyone around him on the road. When he was stepped out of the car, his loaded gun fell to the ground and could have discharged, harming officers or other commuters on the roadway. Moreover, the defendant engaged in this reckless conduct less than three months after being released for another felony firearms offense involving a loaded privately manufactured firearm with an extended magazine. Although no one was injured, the absence of tragedy here was a matter of luck, not restraint.

**B. The History and Characteristics of the Defendant**

The defendant's criminal history tells a more a lengthy story of firearm possession, use and general violence, as well as failure to comply with release conditions. As noted in the PSR, in 2011, the defendant assaulted a victim for $180 in cash. *See* PSR at ¶30. According to the proffer, the defendant purported to be willing to sell the victim a television but demanded to see the cash upfront. Instead, of providing the product, the defendant snatched the money and then physically attacked the victim. The defendant failed on supervision and was ultimately revoked and sentenced to further incarceration. Even more jarring, in 2011, the defendant also pointed a gun at an off-duty police officer, after the defendant brought the gun to a mosque. *Id.* at ¶31. Then in 2015, he again threatened someone with a gun. This time, he showed up at a school—purportedly

to pick up his daughter—and threatened the principal for being made to wait. Fresh off the heels of his prior incarceration he threated to go get his gun and shoot up the school—a school filled with children. *Id*. at ¶32. In connection with his supervision for that matter, he failed to report for drug testing multiple times. *Id.* Later, in 2022, the defendant was convicted in D.C. Superior Court of Unlawful Possession of a Firearm. *See* PSR at ¶37.

In 2019, the defendant once again armed himself with a firearm. Despite his multiple prior convictions, the defendant was arrested and convicted of having a loaded gun in his pants and another extended magazine in his car. *Id*. at ¶33. His violence and weapon possession continued in the Bureau of Prisons, with an assault in 2022 and a sanction for weapons possession in 2024. And in 2020, seven days after initially being released in connection with his 2019 offense, the defendant was arrested for having a loaded privately manufactured gun with an extended magazine. While incarcerated for that offense, he attacked a uniformed Corrections Officer with a trash can severely enough that the officer had to get stitches. Then less than three months after his release, he committed the instant offense. The temporal proximity of his most recent case and the fact that his adult criminal history spans more than ten years is significant here. It demonstrates that prior court supervision, leniency and intervention failed to deter him from returning to precisely the same dangerous conduct. The defendant's consistent pattern of criminal conduct over his adult life is very concerning and mandates a meaningful period of incarceration in order to protect the community.

In terms of his personal life, the defendant's childhood, while not idyllic appeared to be underpinned by a supportive family. By his own description, his mother, father, and grandmother were all active participants in his life. *Id.* at ¶50. He was always provided for, had a stable residence throughout his childhood and had the opportunity to participate in extracurricular

activities. *Id*. at ¶51. According to his mother, the defendant's descent into criminal behavior was a choice on the defendant's part rather than a byproduct of his upbringing; she stressed that he always had two parents that were involved. *Id*. at ¶52. The defendant also has had educational and employment opportunities, in that he had his GED and was actively employed for a towing company at the time that he decided to ride around in a stolen car with a loaded gun. *Id*. at ¶¶65, 69.

The defendant's conduct placed not only himself, but others in a volatile and dangerous situation. Despite having a supportive family, educational and work opportunities, he repeatedly has chosen to carry firearms and terrorize his commnity. Put simply, when the defendant is in the community, he arms himself. His conduct reflects a repeated and knowing disregard for the law and for the safety of others.

**C. The Need for the Sentenced Imposed to Afford Adequate Deterrence**

A custodial sentence is necessary to achieve both specific and general deterrence. The defendant has already demonstrated that prior firearm prosecution and supervision were insufficient to prevent him from reoffending. A meaningful term of incarceration is therefore necessary to interrupt this cycle and to protect the public from further dangerous conduct. General deterrence is equally important. Illegal firearm possession, particularly involving loaded weapons and a history of flight from police, poses a profound risk to the community. A guidelines sentence communicates that such conduct will be met with firm and predictable consequences.

As noted previously, this is not the defendant's first firearm offense. Given his history, it is clear that the defendant did not learn from his past conduct. Therefore, a term of incarceration is also necessary to deter the defendant from unlawfully possessing firearms in the future.

**D. The Desire to Avoid Unwanted Sentence Disparities**

Finally, one of the goals of the Guidelines is to avoid sentence disparities among similarly situated defendants. According to data collected by the United States Sentencing Commission, of the firearms cases reported to the Commission in from Fiscal Years 2021 to 2025 where the defendant was sentenced pursuant to U.S.S.G. § 2K2.1, and had Criminal History Category of VI, the average incarceration length was 50 months' imprisonment, and the median incarceration length was also 51 months' imprisonment. *See* United States Sentencing Commission, Judiciary Sentencing Information (JSIN), https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited on September 22, 2026).

As evidenced by the Sentencing Commission's data, the government's requested sentence of 51 months' imprisonment is measured, reasonable, driven by data, and squarely in line with sentences given to similarly situated defendants. It also is warranted by the seriousness of the offense, protects the public, and promotes respect for the law.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the court sentence the defendant to 51 months' imprisonment, to be followed by three years of supervised release.

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By: */s/ Caelainn Carney*
CAELAINN CARNEY
Assistant United States Attorney
N.Y. Bar No. 5751672
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-714-6433
Email: caelainn.carney@usdoj.gov